IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NEW YORK
_____

UNITED STATES OF AMERICA

                v.                                    16-CR-6071FPG

EMANUEL L. LUTCHMAN,

                Defendant.
_____

## GOVERNMENT'S SENTENCING MEMORANDUM

The United States of America, by and through its attorneys, James P. Kennedy, Jr., Acting United States Attorney for the Western District of New York, and Brett A. Harvey, Assistant United States Attorney, hereby makes and files its sentencing memorandum relating to the defendant, EMANUEL L. LUTCHMAN.

## I.    FACTUAL AND PROCEDURAL BACKGROUND

### A.    Procedural History

On December 30, 2015, the defendant, EMANUEL L. LUTCHMAN, was arrested by special agents of the Federal Bureau of Investigation (FBI) and other members of the Joint Terrorism Task Force (JTTF), one day before he planned to commit an armed attack in the name of the Islamic State of Iraq and the Levant (ISIL) on New Year's Eve at a restaurant/bar in Rochester.   He was subsequently charged by complaint with one count of attempting to provide material support to ISIL, in violation of Title 18, United States Code, Section 2339B(a)(1).

On August 11, 2016, the defendant pled guilty, pursuant to a written plea agreement, to a one-count Information charging him with conspiracy to provide material support and resources – specifically, personnel and services – to ISIL, in violation of Title 18, United States Code, Section 2339B(a)(1).   The plea agreement provides that the defendant' sentencing range under the United States Sentencing Guidelines (hereinafter "Sentencing Guidelines") is a term of 240 months imprisonment, which is the statutory maximum for the offense of conviction, and a term of lifetime supervised release.   The defendant is scheduled to be sentenced by this Court on January 26, 2017.

B.      **Summary of Offense and Relevant Conduct**[1]

The facts and circumstances of the offense of conviction are set forth in detail in the factual basis of the plea agreement and the Pre-Sentence Investigation Report (PSR).   Briefly, the defendant admitted to conspiring to provide material support and resources to ISIL by planning to conduct an attack on American soil on New Year's Eve.   The defendant's purpose in planning and committing the attack was to prove his allegiance to ISIL in order to later gain membership in and join ISIL overseas.

In December 2015, the defendant – an ardent online supporter of ISIL – obtained an online document written by an ISIL member in Syria.   The document, inter alia, provided guidance to ISIL supporters who were seeking to travel overseas to join ISIL, declared it was a religious duty to rise up and kill those living in the land of the "kuffar" (meaning non-believers or infidels), and stated that an attack could be accomplished with a weapon as simple as a kitchen knife.   The

---

1 The plea agreement and Pre-Sentence Investigation Report contain detailed summaries of the defendant's offense of conviction and relevant conduct.

2

document also contained online contact information for an individual known as Abu Issa Al-Amriki a/k/a Abu Sa'ad Al-Sudani, who at the time was an active ISIL recruiter and external attack planner located in Syria.

The defendant subsequently initiated a series of online communications with Al-Amriki. In those communications, the defendant declared his hatred for America and his intention to make "hijra" (meaning migration or journey to join ISIL overseas).   Al-Amriki told the defendant that, in order to join ISIL overseas, the defendant would have to prove himself to ISIL. Al-Amriki directed the defendant to plan an attack for New Year's Eve and kill as many non-believers as possible.   Al-Amriki also told the defendant to make a video before the attack and that, after the attack was completed, ISIL would post the video on the Internet and claim responsibility for the attack.   In subsequent communications with Al-Amriki, the defendant provided updates on the status of the planned attack.   At one point, the defendant sought guidance from Al-Amriki about the best target for the New Year's Eve attack.   Al-Amriki told the defendant to find the most populated area and kill as many people as possible.   In addition, Al-Amriki told the defendant that, after the operation was done, he would vouch for the defendant and any other participants in the attack, and would start sending them to join ISIL in Libya.

In late December 2015, the defendant was communicating with Individuals A and B, both of whom were cooperating with the FBI.   In those communications, the defendant made statements expressing his strong support of ISIL and his desire to travel overseas to join ISIL. The defendant also discussed with Individuals A and B his communications with Al-Amriki and the plan to commit an attack in the United States on New Year's Eve.   After learning about the defendant's planned attack, the FBI used Individual A to introduce Individual C, who was also cooperating with the FBI, to the defendant.   The defendant told Individual C about his

3

communications with Al-Amriki and the plan to conduct the attack to prove his allegiance to ISIL and ultimately make hijra.

Thereafter, the defendant advanced his plans for the attack, with the assistance of Individual C.   The defendant identified the target for the attack – a specific restaurant/bar in Rochester – and the method they would use to conduct the attack – knives and a machete.   In addition, the defendant stated that they would need gloves, masks and zip ties to carry out the attack.   Subsequently, the defendant and Individual C went to a Wal-Mart to purchase weapons and supplies for the attack.   While there, they bought two black ski masks, two knives, a machete, zip ties, duct tape, ammonia and latex gloves.   Individual C paid approximately $40 for these items, but the defendant assured Individual C that he would reimburse him for the funds.   After purchasing the weapons and supplies, the defendant discussed the planned attack with Individual C.   The defendant confirmed the target of the attack and stated that any victims of the attack would have to be killed.   The defendant and Individual C discussed making a video before the attack, in which they would explain their rationale for the attack (i.e., to take the offensive to the kuffar) and swear allegiance to the leader of ISIL, Abu Bakr al-Baghdadi.   The defendant planned to release the video after the attack was completed.

On December 29, 2015, the defendant had additional online communications with Al-Amriki.   In those communications, the defendant told Al-Amriki that he was going to read an interpretation of the Quran to get his "head n soul ready for [the] operation."   The defendant also confirmed that he – along with Individuals A and C – were going to conduct the New Year's Eve attack, as planned.

4

On December 30, 2015, the day before the planned attack, the defendant met with Individual C.   During the meeting, the defendant made a video in which he pledged allegiance to ISIL and its leader, Abu Bakr al-Baghdadi, and stated that ISIL was going to establish the caliphate in the land of Islam.   In reference to the planned New Year's Eve attack, the defendant stated, "the blood that you spill of the Muslim overseas we gonna spill the blood of the kuffar," and asked Allah to "make this a victory."   Immediately after the video was made, agents and officers from the Rochester JTTF arrested the defendant.

## II.    STATUTORY AND SENTENCING GUIDELINES RANGE

The offense of conviction – conspiracy to provide material support and resources to a designated terrorist organization – carries a maximum sentence of 20 years imprisonment, a $250,000 fine, and a lifetime term of supervised release.   In the written plea agreement, the parties set forth alternative calculations under the Sentencing Guidelines.

The government maintains that the defendant's total offense level is 37 and, with a Criminal History Category of VI, his Sentencing Guidelines range is the statutory maximum of 240 months imprisonment.   In this regard, the government argues that the three-level reduction under Sentencing Guidelines § 2X1.1(b)(2) does not apply to the facts in this case.   Meanwhile, the defendant contends that the three–level reduction under Sentencing Guidelines § 2X1.1(b)(2) does apply and that, as a result, the defendant's total offense level is 34.[2]   With a total offense level of 34 and Criminal History Category of VI, the defendant's Sentencing Guidelines range would still be the statutory maximum of 240 months imprisonment.   The PSR agreed with the

---

2 The defense filed a sentencing memorandum on January 20, 2017.   The government will file a response to this memorandum separately from the instant sentencing memorandum.

government's version of the Sentencing Guidelines calculations, finding that the three-level reduction under Sentencing Guidelines § 2X1.1(b)(2) does not apply to the facts in this case.

On January 20, 2017, the government filed a "Statement With Respect to Sentencing Factors," in which the government stated its agreement with the Sentencing Guidelines calculations contained in the PSR.

## III.   STATUTORY SENTENCING FACTORS

As detailed above, the plea agreement provides that – under either the government's or the defendant's Sentencing Guidelines calculations – the defendant's sentencing range is the statutory maximum of **240 months imprisonment**.   The government submits that such a sentence is appropriate and would not be "greater than necessary" to comply with the objectives set forth in Title 18, United States Code, Section 3553(a).

Title 18, United States Code, Section 3553(a) requires that the Court "impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in [18 U.S.C. § 3553(a)(2)]."   In determining the sentence, the Court must consider the following factors:

(1)   the nature and circumstances of the offense and the history and characteristics of the defendant;

(2)   the need for the sentence imposed—

(A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

(B) to afford adequate deterrence to criminal conduct;

(C) to protect the public from further crimes of the defendant; and

(D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;

(3) the kinds of sentences available;

(4) the kinds of sentence and the sentencing range established for–

    (A) the applicable category of offense committed by the applicable category of defendant as set forth in the guidelines--

        (i) issued by the Sentencing Commission pursuant to section 994(a)(1) of title 28, United States Code, subject to any amendments made to such guidelines by act of Congress (regardless of whether such amendments have yet to be incorporated by the Sentencing Commission into amendments issued under section 994(p) of title 28); and

        (ii) that, except as provided in section 3742(g), are in effect on the date the defendant is sentenced; or

. . .

(5) any pertinent policy statement–

    (A) issued by the Sentencing Commission pursuant to section 994(a)(2) of title 28, United States Code, subject to any amendments made to such policy statement by act of Congress (regardless of whether such amendments have yet to be incorporated by the Sentencing Commission into amendments issued under section 994(p) of title 28); and

    (B) that, except as provided in section 3742(g), is in effect on the date the defendant is sentenced.

(6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and

(7) the need to provide restitution to any victims of the offense.

18 U.S.C. § 3553(a).

In executing these statutory responsibilities, the Court must first correctly calculate the applicable Guidelines range. Gall v. United States, 552 U.S. 38, 49 (2007).  This range is "the starting point and the initial benchmark." Id.  Although this Court must treat the Guidelines as advisory, United States v. Ratoballi, 452 F.3d 127, 131-32 (2d Cir. 2006), an error in determining

7

the applicable Guidelines range or the availability of departure authority nonetheless would be the type of procedural error that could render a sentence unreasonable on appellate review. United States v. Selioutsky, 409 F.3d 114, 118 (2d Cir. 2005).   Further, while this Court "does not enjoy the benefit of a legal presumption that the Guidelines sentence should apply," Rita v. United States, 551 U.S. 338, 351 (2007), the Second Circuit has observed that "in the overwhelming majority of cases, a Guidelines sentence will fall comfortably within the broad range of sentences that would be [upheld as] reasonable in the particular circumstances." United States v. Fernandez, 443 F.3d 19, 27 (2d Cir. 2006). See also United States v. Eberhard, 525 F.3d 175, 179 (2d Cir. 2008).

Next, after giving the parties an opportunity to argue for whatever sentence they deem appropriate (consistent with any limitations imposed by the plea agreement), this Court must then "consider all the § 3553(a) factors to determine whether they support the sentence requested by a party." Gall, 552 U.S. at 49-50.   In determining whether the § 3553(a) factors support the requested sentence, the Court "must make an individualized assessment based on the facts presented." Id. at 50.   In that regard, "[n]o limitation shall be placed on the information concerning the background, character and conduct of a person convicted of an offense which a court . . . may receive and consider for the purpose of imposing an appropriate sentence." 18 U.S.C. § 3661.   If a non-Guidelines sentence is warranted, the Court "must consider the extent of the deviation and ensure that the justification is sufficiently compelling to support the degree of the variance." Gall, 552 U.S. at 50.

After settling on the appropriate sentence, the Court "must adequately explain the chosen sentence to allow for meaningful appellate review and to promote he perception of fair sentencing." Id. (citing Rita, 551 U.S. at 351).   Although this Court need not engage in "robotic

incantations" with respect to its consideration of the § 3553(a) factors, <u>Fernandez</u>, 443 F.3d at 30, "[t]he sentencing judge should set forth enough to satisfy the appellate court that he has considered the parties' arguments and has a reasoned basis for exercising his own legal decisionmaking authority." <u>Rita</u>, 551 U.S. at 356.

## A.    Nature and Circumstances of the Offense

In this case, the crime committed by the defendant – conspiring to provide material support and resources to ISIL – is grave and terrifying.   It is difficult to overstate the seriousness of this offense.   The defendant admitted to conspiring with an ISIL member in Syria – an individual known as Abu Issa Al-Amriki a/k/a Abu Sa'ad Al-Sudani – to carry out a terrorist attack on American soil and kill innocent civilians in the name of ISIL.   ISIL is a designated foreign terrorist organization that has been engaged in a campaign of brutal violence and deadly attacks in Iraq and Syria for more than three years, and has inspired acts of terrorism throughout the world (including the United States, Germany, France, and Belgium).   The defendant agreed to conduct the attack to prove his allegiance to ISIL and enable him to later gain membership in and join ISIL on the battlefield overseas.   Not only did the defendant conspire to commit the attack, but he also took the steps necessary to fulfill the plan and carry out the attack.   After initially formulating the plan with Al-Amriki, the defendant selected a target, determined the manner and means of the attack, purchased weaponry and supplies for the attack (with the assistance of Individual C), and recorded the bayah (meaning oath or allegiance) video that Al-Amriki directed him to make so that ISIL could publicize and claim responsibility for the attack. All that remained to successfully carry out the attack was for the defendant show up at the target location on New Year's Eve.

These facts, by themselves, would warrant imposition of the maximum sentence under the law.   But it is important to note that, at the time of the conspiracy, Al-Amriki was an actual external attack planner and influential recruiter for ISIL in Syria.   According to a press briefing by the Department of Defense in May 2016,[3] Al-Amriki was an ISIL member who actively sought to harm Western interests, and was involved in planning attacks against the United States, Canada, and the United Kingdom.   Al-Amriki and his wife, Umm Isa Amriki, were also active in recruiting foreign fighters in efforts to inspire attacks against Western interests.   Al-Amriki and his wife were killed during an airstrike by coalition forces near Al-Bab, Syria, on April 22, 2016, less than four months after the conspiracy with the defendant.

One of the most critical threats to our national security is the prospect of terrorist attacks committed on American soil by individuals inspired or directed by ISIL.   Over the last three years, there have been a number of ISIL-inspired attacks in the United States, and ISIL-directed attacks in Europe (including Germany, France and Belgium).   In this case, the defendant was both inspired and directed by ISIL – through Al-Amriki, a <u>bona</u> <u>fide</u> ISIL recruiter and attack planner – in his plot to conduct the New Year's Eve attack in Rochester.   Without swift and decisive action by the JTTF, Rochester would have joined the list of cities devastated by horrific, senseless acts of terrorism committed against innocent civilians in the name of ISIL.

**B.** <u>**History and Characteristics of the Defendant**</u>

The defendant is a 26-year old United States citizen, who, until his arrest on December 30, 2015, lived in Rochester, New York.   He has been detained in federal custody since his arrest.

---

[3] A full transcript of the Department of Defense Press Briefing by Pentagon Press Secretary Peter Cook on May 5, 2016, can be found at the Department of Defense website at www.defense.gov.

The defendant is a self-professed Muslim convert with a criminal history dating back to 2006, as well as previous state Mental Hygiene arrests.   His criminal history includes a prior conviction for a violent felony offense – Robbery 2° – for which he was sentenced to 5 years in prison.   While on parole for this conviction, the defendant had his parole revoked on three separate occasions, due to a variety of violations, including new arrests, smoking marijuana and using alcohol excessively, violating his curfew, fighting with family members and others, and starting a fire at his girlfriend's residence.   The defendant also has three prior misdemeanor convictions for Criminal Mischief 3° (2013), for which he was sentenced to 1 year in jail; Petit Larceny (2015), for which he was sentenced to 4 months in jail; and Menacing 2° (2015), for which he was sentenced to 4 months in jail.

While the PSR indicates that the defendant has a history of mental health problems, there has been no claim in this case that the defendant did not understand the nature of his criminal acts.   Moreover, the government submits that the defendant's apparent mental instability is not a mitigating factor warranting a lenient sentence from the Court, but is an aggravating factor warranting a severe prison sentence.   A person like this defendant – a convicted violent felon who ascribes to an extremist ideology and is open to overtures from an overseas terrorist organization – is precisely the type of person that would agree to and actually commit a terrorist attack in the United States.

C.      **Requested Sentence**

The government submits that the statutory maximum sentence of **240 months imprisonment** is a fair and just sentence under the facts and circumstances of this case.   Such a severe sentence adequately accounts for the grave nature and circumstances of the offense of

conviction, the criminal history and personal characteristics of the defendant, the seriousness of the offense of conviction, and the need to protect the public from further crimes by the defendant. In addition, such a sentence would promote respect for the law and deter others in this District and elsewhere in the United States from seeking to communicate with ISIL and conduct armed terrorist attacks on American soil.

## IV.    TERM OF SUPERVISED RELEASE

Considering the nature and circumstances of the offense of conviction, and the defendant's criminal history, the government respectfully requests that this Court impose a lifetime term of supervised release, to include monitoring of Internet and computer usage.   The defendant, who is currently 26 years old, has had numerous contacts with the criminal justice system, which resulted in him serving a number of significant stints in prison (including a 5-year term for his Robbery 2°).   Despite these sentences, the defendant has consistently failed to conform his behavior to the law and societal norms.

If the Court sentences the defendant to the statutory maximum sentence, the defendant will be in his mid-40s by the time he completes his prison sentence.   The goal is that the defendant will leave federal prison a changed person, who will reject terrorism and disavow ISIL (and other terrorist groups), and refrain from being involved in further criminal activity.   Unfortunately, there is no guarantee that he will do so.   In fact, the defendant's history of re-offending shows that the prospects for his rehabilitation are dim.   Under these circumstances, the government submits that a lifetime term of supervised release is necessary to protect the public from new crimes by the defendant and deter the defendant, under the threat of re-incarceration, from committing new offenses against the United States.

## V.   <u>CONCLUSION</u>

Based on the foregoing, the government respectfully recommends that the Court sentence the defendant to the statutory maximum of **240 months imprisonment** and impose a lifetime term of supervised release.

DATED:        Rochester, New York
              January 23, 2017

                                        Respectfully submitted,

                                        JAMES P. KENNEDY, JR.
                                        Acting United States Attorney
                                        Western District of New York

                          BY:    _s/ Brett A. Harvey_____
                                        BRETT A. HARVEY
                                        Assistant U.S. Attorney
                                        Western District of New York
                                        100 State Street, Suite 500
                                        Rochester, New York
                                        (585) 399-3949
                                        brett.harvey@usdoj.gov

TO:   Steven G. Slawinski, Esq.
      Counsel for Defendant

      United States Probation Department
      Attn:   David B. Spogen
              U.S. Probation Specialist